IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 1, 2005

## STATE OF TENNESSEE v. FREDDIE T. INMAN, JR.

**Direct Appeal from the Circuit Court for McNairy County**
**No. 1656     Jon Kerry Blackwood, Judge**

———————————————

**No. W2004-02371-CCA-R3-CD  - Filed March 30, 2005**

———————————————

The defendant was convicted of theft of property greater than $1,000 but less than $10,000, a Class D felony, and was sentenced as a career offender to twelve years in the Department of Correction. On appeal, the defendant raises the following issues: (1) whether the evidence was sufficient to sustain his conviction; and (2) whether the trial court erred in granting the State a continuance over the defendant's motion to dismiss, in not granting the defense a continuance because of a missing witness, in limiting cross-examination of a witness, in denying a continuance due to a witness who was not subpoenaed, in not allowing the testimony of two witnesses at the hearing on the motion for a new trial, and in sentencing the defendant as a career offender. Finding the evidence sufficient to support the conviction and no reversible error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Karen Tucker Fleet, Bolivar, Tennessee, for the appellant, Freddie T. Inman, Jr.

Paul G. Summers, Attorney General and Reporter; Kathy D. Aslinger, Assistant Attorney General; and Elizabeth T. Rice, District Attorney General, for the appellee, State of Tennessee.

**OPINION**

<u>FACTS</u>

The defendant, Freddie T. Inman, Jr., was convicted of theft of property having a value of over $1,000 but less than $10,000, specifically truck mirrors and taillight assemblies that he stole from his employer, Reitter & Schefenacker USA ("Schefenacker"), in Selmer, Tennessee, between December 2001 and April 2002.

The State's first witness, James Dunn, testified that he operated Dunn's Used Cars and Parts, a salvage yard, in Corinth, Mississippi, between December 2001 and April 2002 but was currently serving a sentence in the Corinth City Jail on a state conviction for operating a "chop shop." He also admitted to a "Dyer Act" conviction for "transporting stolen vehicles across state lines" in the 1970s. Dunn stated that he bought truck mirrors and taillight assemblies "from a fellow telling [him] that he was Freddie Inman." The person who sold him the automotive parts went by the name of "T.J. Inman" and was accompanied by a "black guy." The defendant first came to his shop offering to sell the parts in December 2001, and Dunn bought approximately twenty-five sets of mirrors and four or five taillights for $500. A few weeks later, the defendant returned in a pickup truck, and Dunn bought thirty to thirty-five pairs of mirrors for $300. The defendant returned a third time with more mirrors and offered to sell them for fifty cents each, but Dunn told the defendant he had all he needed. He testified that he had also bought some mirrors in the past from a truck driver named Junior Rushing. Eventually, two men and a woman came to his business and asked to buy mirrors. After looking at some mirrors, the lady identified herself as "a Butler" and said she was from Schefenacker and that the mirrors were stolen. Dunn told her she could not take all of the mirrors that he had in stock but gave her one pair for identification purposes. Later, Dunn called the sheriff's department in Corinth who told him "to hold onto them until some kind of law official did [sic] come and get them." A few days later, a city policeman came to the salvage yard and recovered sixty-four pairs of mirrors and five taillight assemblies purportedly belonging to Schefenacker. Dunn stated he believed he had bought sixty-five pairs of mirrors and four or five taillight assemblies from the defendant, and he had sold "two or three pair of mirrors." On cross-examination, Dunn stated that he could not "swear that this man here [the defendant] and the one that come to the shop are the same person," as it had been almost three years since he bought the parts from the defendant.

Russell Haney, the owner of Highway 64 Motor Company in Selmer, Tennessee, testified that he sells automobiles and various truck accessories. He stated that between December 2001 and April 2002, he bought Chevrolet Silverado and Dodge truck mirrors from the defendant. The defendant came to Haney's business "two to six times" selling mirrors, and Haney bought a total of fifty sets of mirrors, for which he paid the defendant $15 to $20 per set. Later, a man and a woman came to his shop, identifying themselves as Schefenacker employees and the mirrors as company property. Law enforcement officers subsequently advised Haney that the mirrors were stolen. The police recovered at least twenty-five sets of mirrors from Haney's business. On cross-examination, Haney testified that the defendant told him the mirrors were scrap parts which had been discarded by Schefenacker, and some of the mirrors actually had scratches on them. He also had bought scrap parts in the past from other Schefenacker employees. Haney identified the defendant in court as the seller of the parts.

Jason Rodotz, an employee of Schefenacker since December 2000, testified that he was the warehouse supervisor from October 2001 until October 2002. During that time, Schefenacker operated two "off-site" warehouses, the "old Henco Furniture warehouse" and the TRM building in Selmer. Rodotz supervised the defendant at both warehouses, and the defendant worked "odd" and "unusual" hours early in the mornings. Often, the defendant, who had his own key, worked alone in the warehouses. Finished products, including mirrors for Chevrolet and Dodge trucks, were stored

at the TRM warehouse, and the defendant was a material handler whose job entailed, among other things, unloading trucks coming from the manufacturing plant to the warehouse. Products damaged during manufacture were placed in a scrap area in the plant to be torn down and reclaimed or destroyed. Defective parts were not sent to the warehouse, nor were they intentionally shipped to customers. In addition, defective or damaged parts were not given to employees, nor were they thrown away where others could access them.

Between December 2001 and April 2002, the company received numerous complaints from customers concerning orders which were short of parts. Someone placed a "tip" in the employees' suggestion box as to where the missing products could be found, and Rodotz later helped recover them. Rodotz stated that he never gave the defendant permission to take parts from the warehouse or the manufacturing plant.

On cross-examination, Rodotz could not remember the exact date he began supervising the defendant but recalled that the defendant began helping transfer parts from the Henco building to the new TRM building in January 2002. He did not recall the defendant and a person named Glenn Jernigan[1] assisting him in removing parts left in the Henco warehouse during the transition. Rodotz acknowledged that he testified at the preliminary hearing that there may have been occasions when he told employees to throw things in the dumpster but may not have followed up to make sure his orders were followed. He denied that the defendant ever said, "We're throwing these in the dumpster, can I just have them?" or that he responded, "I don't care; get rid of them." Later, he testified that he followed up on his orders to destroy damaged and scrap parts "[n]inety-nine percent of the time." On redirect, he said that the parts recovered from Dunn's and Haney's businesses were new parts manufactured "around April and May of 2002," and new production would not have been thrown into the dumpster.

Donna Butler, former Director of Human Resources at Schefenacker, testified that the company began receiving complaints of shorted orders from customers in early 2002, and she described the steps taken in the manufacturing plant to solve the problem. She said that the company would "absolutely not" have given away parts to employees or thrown them into the dumpsters, especially in light of the demand from customers at the time. Someone placed an anonymous tip in the employees' suggestion box indicating that missing parts could be found at Dunn's in Corinth, Mississippi. Butler telephoned Dunn and inquired about a certain mirror, which Dunn said he had in stock. Butler said that was "fishy," as the mirror about which she inquired had just been placed in production. They then went to Dunn's business, where he explained how he came into possession of the mirrors and told them about Highway 64 Motor Company. In addition, Dunn gave a description of the defendant and the vehicle he drove. Butler contacted Investigator Roger Rickman of the Selmer Police Department, and he accompanied them to Highway 64 Motor Company, where they recovered more mirrors and Haney advised them that the defendant had sold him the mirrors. Butler stated neither she nor anyone else gave the defendant permission to take parts from the

---

[1]In the record, Jernigan is sometimes referred to as "Glenn" and sometimes as "Quinn." This is important only because Jernigan's lack of testimony is the subject of one of the defendant's issues on appeal.

company. On cross-examination, she stated that damaged or scratched parts were never thrown in the dumpster but were torn apart for refurbishing or recycling.

Kenneth McDonald, a technical engineer and manager at Schefenacker, testified concerning measures that were taken to deal with customer complaints concerning shortages, as well as the trip to Corinth, Mississippi, based on the anonymous tip in the suggestion box. The company was able to recover between $5,500 and $5,600 worth of products from the two businesses, and complaints from customers concerning shortages had not been a problem since the defendant's termination. At the time of the thefts, the defendant, who had his own key to the warehouse, loaded most of the trucks and pulled products in the warehouse for shipping to customers. The recovered mirrors were newly produced and contained "date, code and time stamp[s]," as well as "end-of-the-line signatures" indicating that the mirrors had passed final inspection. McDonald did not give anyone permission to take products from the warehouse, and no one had permission to toss the "good currently produced mirrors into the dumpster." On cross-examination, he stated that he had no knowledge of customer complaints concerning missing parts before December 2001. Any parts damaged at the warehouse would have been returned to the manufacturing plant for reclamation of usable parts and destruction of unusable parts. He recalled that Rodotz, Quinn Jernigan, and a "Mr. Aaron"[2] assisted in organizing the TRM warehouse when it opened in mid-2001. However, he also stated that when products were moved from the Henco warehouse to the TRM warehouse, none of the products would have been thrown into dumpsters.

Roger Rickman, a Selmer Police Department Criminal Investigator, testified that Butler advised him of the "tip" in the suggestion box as well as the results of their trip to Corinth, Mississippi. Rickman went with the Schefenacker employees to Highway 64 Motor Company and recovered the mirrors from Haney. Two days later, he went to Dunn's and recovered the remainder of the mirrors. Based on his interviews with Dunn and Haney, he arrested the defendant. After advising the defendant of his rights, Rickman took a written and signed statement from the defendant, which he read to the jury, with the defendant admitting to selling mirrors belonging to Schefenacker:

Q. Have you sold Russell Haney at Highway 64 Motor Company any mirrors that came from Schefenacker?

A. Yes, ones that came from Henco warehouse.

Q. How many sets of mirrors did you sell Russell Haney?

A. About 40 pairs.

Q. How much did Russell give you for them?

---

[2]We assume, from the context, that the record should reflect "Mr. Inman," the defendant, rather than "Mr. Aaron."

A. For all of them, he gave me about $350.00.

Q. How many times did you sell parts from Schefenacker to Russell?

A. Just one time.

Q. How did you acquire the mirrors you sold?

A. They were at the Henco warehouse to be thrown away and I asked my boss, Jason Rodotz, if I could have them and he said yes and I loaded them in my truck in daylight.

Greg Galloway, testifying for the defense, stated that he was a quality manager at Schefenacker. He recalled that the defendant and his supervisor at the time, Darrell Ingel, had approached him and asked if they could have a set of Chrysler doors that had been used for testing, and he gave them the doors. Also, there were times when employees asked for "a mirror or something" for their cars and were given a scratched or damaged product. Between December 2001 and April 2002, his "general thought" was that some rejected materials were discarded in a dumpster at the warehouse. However, on cross-examination, he stated that complete, assembled mirror sets which were damaged were not thrown into the dumpster but were disassembled and reused. At no time would a complete assembly be thrown into the dumpster. He also stated that the set of doors he gave the defendant was manufactured by Chrysler and sent to Schefenacker for use with mirror tests, and he gave them to the defendant only after the tests were completed.

The defendant elected not to testify.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant argues that the evidence was not sufficient to support his conviction, focusing primarily on Rodotz' testimony that he was uncertain of the dates he supervised the defendant in the warehouse and the fact that one of the State's witnesses, James Dunn, was a convicted felon who "could not swear that the individual who sold him stolen car parts was the defendant." The State argues that the evidence was sufficient to support the jury's verdict.

In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is

insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). In other words, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that might be drawn from the evidence. See State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In Tennessee, a person commits the crime of theft of property when that person "knowingly obtains or exercises control over the property" of another without the owner's effective consent and with the intent to deprive the owner of the property. See Tenn. Code Ann. § 39-14-103 (2003). If the property has a value of $1,000 or more, but less than $10,000, the theft is a Class D felony. See Tenn. Code Ann. § 39-14-105(3) (2003).

Viewed in the light most favorable to the State, the evidence in this case was more than sufficient to support the defendant's conviction for theft of property. Rodotz and McDonald testified that the defendant had his own key to the warehouse where completed parts were stored and he worked odd hours, often alone, at the warehouse. Dunn gave a description of the defendant and his truck, and although he could not say for certain that the defendant was the same "T.J. Inman" who sold him the parts, another purchaser, Haney, did not hesitate in identifying the defendant in court as the seller. Rodotz, Butler, and McDonald each testified that no one at the company gave the defendant permission to take the mirrors, and the mirrors he sold were new production that would not have been discarded. In addition, McDonald testified that the value of the mirrors was between $5,500 and $5,600 and that the complaints from customers of shorted orders ceased after the defendant was fired. Finally, the defendant gave a signed confession to the police in which he admitted selling to Haney parts belonging to Schefenacker, although he claimed to have permission from his supervisor. Rodotz, the defendant's supervisor, testified, however, that he never gave the

defendant permission to take parts from the plant or the warehouse. Accordingly, we conclude that the evidence was more than sufficient for a rational jury to determine that the defendant knowingly obtained control over property belonging to Schefenacker, without the owner's effective consent and with the intent to deprive the owner of the property. In addition, there was sufficient proof of the property's value.

Although the defendant attacks Dunn's credibility on appeal because he was a convicted felon, we note that the State presented Dunn's record to the jury, and the defendant had a sufficient opportunity to question Dunn about his criminal record. The credibility of witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the evidence are matters entrusted exclusively to the jury as the triers of fact. State v. Cribbs, 967 S.W.2d 773, 793 (Tenn. 1998). It is not the prerogative of this court to revisit questions of witness credibility on appeal, that function being within the province of the trier of fact. See generally State v. Carey, 914 S.W.2d 93, 95 (Tenn. Crim. App. 1995); State v. Boling, 840 S.W.2d 944, 947 (Tenn. Crim. App. 1992).

## II. Trial Court Error

The defendant alleges several procedural errors were committed by the trial court, including granting the State a continuance on February 19, 2004, the scheduled first day of trial, due to an absent State's witness and denying the defendant a continuance on February 25, 2004, when defense witness Quinn Jernigan was not present due to illness. In addition, the defendant argues the trial court erred in denying a continuance on February 25 after the defendant advised the court that an "essential" defense witness, Darrell Ingel, had not been subpoenaed. The State submits that the defendant has waived all challenges to the trial court's granting and denial of continuances by failing to include the transcript of the relevant proceedings in the record.

The trial record on appeal begins with the State's proof on the first day of trial on February 25, 2004, but includes none of the proceedings relevant to the trial court's granting or denial of continuances by the State or the defendant. It is the defendant's duty to ensure that the record on appeal contains all of the evidence relevant to those issues which are the bases of the appeal. See Tenn. R. App. P. 24(b); State v. Ballard, 855 S.W.2d 557, 560-61 (Tenn. 1993) (defendant's failure to provide court with complete record relevant to issues presented constitutes waiver of those issues); State v. Draper, 800 S.W.2d 489, 493 (Tenn. Crim. App. 1990) (appellate court is precluded from considering issue when record does not contain transcript of what transpired in trial court with respect to that issue). Accordingly, "[i]n the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence." State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991).

As an additional matter, the defendant argues the trial court erred in not allowing him to thoroughly cross-examine Rodotz concerning alleged inconsistencies between his trial testimony and his testimony at the preliminary hearing. Initially, we note that the record does not contain a transcript of the preliminary hearing nor any other record of what transpired at the preliminary hearing. Nonetheless, from our review of the trial transcript, we cannot conclude that the trial court

unduly restricted the defendant's cross-examination of Rodotz. In fact, the defendant asked Rodotz several questions at trial regarding his preliminary hearing testimony:

Q.     When did he [the defendant] start working under your supervision?

A.     Within probably six months of me starting.

Q.     When did you start?

A.     I started in December of 2000.

Q.     You started in December of 2000, so you think he was under your supervision as of June of 2001?

A.     Yes.

Q.     Do you recall your testimony back at the preliminary hearing back on January 30th in this cause? Do you remember being here in this courtroom –

A.     Yes, I do.

Q.     – on that witness stand? And do you remember testifying that you began supervising [the defendant] probably about January of 2002?

A.     January of 2002. I'm not for sure exactly when. I can't tell you right off the top of my head.

Q.     All right. So you're not actually sure of the date. . . .

. . . .

Q.     Let me go back to your testimony of January 30th. Do you recall testifying at the preliminary hearing that parts were missing all the time from Schefenacker? Do you remember testifying to that?

A.     I know we – I remember testifying that the parts were missing that the customers were receiving, was calling us and saying there were parts missing.

Q.     Uh-huh. Do you remember testifying that you may have told someone to throw items in dumpsters and you may not have followed up on your instructions or followed up that your orders were carried out?

A.      No.  There were P-Pap parts that we did have to destroy that was – I think they was [sic] over three years old that we had to destroy but nothing that we ran in current production, which is where we found it.

Q.      But your testimony was that there may have been occasions when you instructed individuals to throw things into the dumpster and you may not have followed up on – see if your orders were carried out.  Would that be a fair statement of what you said at that hearing?

A.      Yes.

. . . .

Q.      Do you recall at the January 30th preliminary hearing testifying that, "Yes, [the defendant] was the only person that the company investigated"?  If you don't recall, that's fine.  Just say –

A.      I don't recall.

Q.      I'm not trying to trick you.

A.      No, I know.  I just don't recall.

Q.      That's fine.  If you don't recall, just say, "I don't recall."

The only exchange the defendant points to in his brief as an example of the court unduly limiting his right to cross-examine Rodotz was the following exchange in which the defendant asked about the destruction of so-called "P-Pap" parts, those first-run samples which were stored in the warehouse for two to five years before being destroyed:

Q.      Did you ever instruct someone to break things and throw them in the dumpsters and then not follow up on that to see if your orders were carried out?

A.      No.

Q.      I'm sorry?

A.      No.

Q.      So you've always followed up on all of your orders?

A.      Ninety-nine percent of the time.

Q. Okay.

[THE STATE]: Again, this is leading into confusion here. We're talking about –

[DEFENSE COUNSEL]: This is cross-examination –

[THE STATE]: -- products that were found at Dunn's which were not old -- two to five year old things. They were current production.

THE COURT: All right.

[DEFENSE COUNSEL]: I think she's arguing facts not in evidence, and I think I'm entitled to my cross-examination and I'd like to be allowed to continue.

THE COURT: Okay. Let's move on.

Q. Has it ever been a policy about people being able to take parts home?

A. Not while I worked there.

Although the defendant has complained that his counsel's cross-examination was unduly restricted by the court, he has failed to show what areas the trial court did not allow to be explored. Accordingly, we cannot conclude that the trial court, in these rulings, did other than keep the trial within reasonable bounds.

### III. Sentencing

The defendant contends he should have been sentenced as a persistent, rather than a career, offender because he did not have the required number of prior felony convictions to justify classification as a career offender. Further, he argues that he should have been granted "alternative relief due to special circumstances," namely that he was the primary financial provider for his family.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871

S.W.2d 163, 166 (Tenn. Crim. App. 1993), <u>overruled on other grounds by</u> <u>State v. Hooper</u>, 29 S.W.3d 1, 9 (Tenn. 2000).  However, this court is required to give great weight to the trial court's determination of controverted facts as the trial court's determination of these facts is predicated upon the witnesses' demeanor and appearance when testifying.

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment.  Tenn. Code Ann. §§ 40-35-103, -210 (2003); <u>State v. Taylor</u>, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous.  Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; <u>Ashby</u>, 823 S.W.2d at 169.

A career offender is a defendant who has at least six prior felony convictions of any classification (Classes A, B, C, D, or E) if the defendant's current conviction offense is a Class D or E felony.  Tenn. Code Ann. § 40-35-108(a)(3) (2003).  As previously discussed, theft of property having a value of more than $1,000 but less than $10,000 is a Class D felony.  In determining the number of prior convictions for the purpose of offender status, "[c]onvictions for multiple felonies committed as part of a single course of conduct within twenty-four (24) hours constitute one (1) conviction for the purpose of determining prior convictions."  Tenn. Code Ann. § 40-35-108(b)(4) (2003).  This is often referred to as the "twenty-four-hour merger rule."

The sole question on appeal concerning sentencing is whether the defendant was correctly determined to be a career offender.  We conclude that he was.

The defendant, who was twenty-six years old at the time of this trial, already had amassed twenty felony convictions:

| Offense | Offense Date | Adjudication Date | Case Number | County |
|---|---|---|---|---|
| Aggravated Burglary | 03/20/98 | 03/08/99 | 98-040 | Chester |
| Theft $1,000 - $10,000 | 03/20/98 | 03/08/99 | 98-040 | Chester |
| Aggravated Burglary | 03/20/98 | 11/03/98 | 1136 | McNairy |
| Theft $1,000 - $10,000 | 03/20/98 | 11/03/98 | 1136 | McNairy |
| Aggravated Burglary | 03/19/98 | 11/03/98 | 1136 | McNairy |
| Theft $1,000 - $10,000 | 03/19/98 | 11/03/98 | 1136 | McNairy |
| Theft $1,000 - $10,000 | 03/10/98 | 03/08/99 | 99-29 | Henderson |
| Aggravated Burglary | 03/10/98 | 03/08/99 | 99-29 | Henderson |
| Theft $1,000 - $10,000 | 03/10/98 | 03/08/99 | 99-29 | Henderson |
| Aggravated Burglary | 03/10/98 | 03/08/99 | 99-29 | Henderson |

| | | | | |
|---|---|---|---|---|
| Theft $1,000 - $10,000 | 03/10/98 | 03/08/99 | 99-29 | Henderson |
| Aggravated Burglary | 03/03/98 | 03/08/99 | 99-29 | Henderson |
| Burglary (Non-habitation) | 11/21/96 | 06/27/97 | 993 | McNairy |
| Theft $500 - $1,000 | 11/21/96 | 06/27/97 | 994 | McNairy |
| Theft $1,000 - $10,000 | 11/21/96 | 06/27/97 | 994 | McNairy |
| Theft $500 - $1,000 | 11/21/96 | 06/27/97 | 994 | McNairy |
| Theft $1,000 - $10,000 | 11/21/96 | 06/27/97 | 994 | McNairy |
| Theft $1,000 - $10,000 | 11/21/96 | 06/27/98[3] | 994 | McNairy |
| Burglary (Non-habitation) | 11/20/96 | 06/27/97 | 992 | McNairy |
| Aggravated Burglary | 11/18/96 | 06/27/97 | 991 | McNairy |

Based on the above record, the trial court determined that the defendant should be sentenced as a career offender. On appeal, the defendant asserts that if the "twenty-four-hour merger rule" is applied, he would have, at most, five prior convictions, making him a persistent, rather than career, offender. The defendant's argument relies primarily on the assertion that offenses committed on consecutive days, e.g., March 19 and 20, 1998, "could" have been committed within twenty-four hours of each other and thus part of one course of criminal conduct. As we will explain, we disagree with this analysis.

We note first that it is the responsibility of the defendant to establish that offenses which were committed on consecutive days occurred within twenty-four hours of each other. The record is devoid of any proof to support such a claim. See State v. John Roy Polly, No. M1999-00278-CCA-R3-CD, 2000 WL 1606586, at *3 (Tenn. Crim. App. Oct. 27, 2000) (holding that "where the defendant seeks the application of the twenty-four hour rule and the relevant convictions occur on different days, it is the defendant's responsibility to demonstrate that the two offenses occurred within twenty-four hours of each other"). In addition, we previously have held that "[t]he date of adjudication or the entry of judgment is irrelevant when applying the twenty-four hour merger rule." See State v. David Anthony Lee, No. E1999-02537-CCA-R3-CD, 2000 WL 1478570, at *2 (Tenn. Crim. App. Oct. 6, 2000).

As we will explain, the defendant, by our analysis, has at least six sets of convictions, clearly justifying his sentencing as a career offender. McNairy County Case No. 1136 would count as two different convictions, as the offenses occurred on two different dates, March 19 and 20, 1998. Likewise, McNairy County Case No. 992 is a stand-alone conviction, as it occurred on November 20, 1996, and McNairy County Case Nos. 993 and 994 occurred on November 21, 1996. The four offenses committed on March 20, 1998, were committed in two separate counties; therefore, they are not counted as a single conviction. See, e.g., State v. Robert Thomas Harris, No. M2002-01943-CCA-R3-CD, 2004 WL 1562547, at *2 (Tenn. Crim. App. July 13, 2004) (holding that even under the twenty-four-hour rule, felony offenses which occur on the same day may be considered separate offenses when the offenses involve different victims and are "not related in any way"), perm. to appeal denied (Tenn. Nov. 29, 2004). The defendant has not shown that the Harris

---

[3]This appears to be a misprint in the presentence report.

reasoning is not applicable here. Accordingly, we believe the State met its burden of demonstrating a sufficient number of separate convictions for the purposes of sentencing. See State v. Jones, 901 S.W.2d 393, 397 (Tenn. Crim. App. 1995).

As to alternative sentencing, the defendant is not presumed to be a favorable candidate for alternative sentencing, since he is not an "especially mitigated or standard offender." Tenn. Code Ann. § 40-35-102(6). The defendant is a "career offender" and does not meet this criterion. In addition, the defendant would appear to fall into the category of offenders listed in section 40-35-102(5)[4] who are given "first priority regarding sentencing involving incarceration." Also, because the defendant was sentenced to more than eight years, he was not eligible for probation. See Tenn. Code Ann. § 40-35-303(a) (2003). This issue is without merit.

## IV. Motion for New Trial

As a final issue, the defendant asserts that the trial court erred in not allowing two witnesses, Jason Rodotz and Kevin King, to testify at the hearing on the motion for new trial held on May 6, 2004. According to the defendant, Rodotz, whom the defendant subpoenaed for the hearing, perjured himself at trial and the court "should have heard testimony from him at the Motion for New Trial." In addition, King "came forward after [the defendant's] trial to state that [he] too had been given parts while employed at Schefenacker" and was also present at the hearing. The State responds that the defendant failed to support these claims with affidavits; therefore, the trial court did not abuse its discretion in disallowing the testimony. We agree with the State.

The defendant asserts that King's offered testimony, that he had been given a dockplate while employed at Schefenacker, was "newly discovered evidence which might have resulted in a different judgment" and which was "not presented at trial through no fault of the defendant." When a defendant seeks a new trial based on newly discovered evidence, he must show (1) reasonable diligence in seeking the newly discovered evidence; (2) the materiality of the evidence; and (3) that the evidence would likely change the result of the trial. See State v. Nichols, 877 S.W.2d 722, 737 (Tenn. 1994) (citing State v. Goswick, 656 S.W.2d 355, 358-60 (Tenn. 1983)). Whether or not to grant a new trial based on newly discovered evidence, however, lies within the sound discretion of the trial court. See State v. Caldwell, 977 S.W.2d 110, 117 (Tenn. Crim. App. 1997) (citing Hawkins v. State, 220 Tenn. 383, 417 S.W.2d 774, 778 (1967)). In addition, the motion for new trial must be supported by affidavits:

> An accused seeking a new trial on the ground of newly discovered evidence must file an affidavit setting forth facts showing that he and his counsel exercised reasonable diligence and were not negligent in the search for evidence in preparation for the trial

---

[4] "In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, *possessing criminal histories evincing a clear disregard for the laws and morals of society*, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration[.]" Tenn. Code Ann. § 40-35-102(5) (2003) (emphasis added).

of the case, that he and his counsel had no pre-trial knowledge of the alleged newly discovered evidence, and it must be supported by the affidavit of the new witness showing the materiality of the testimony and that it had not been communicated to the accused prior to trial.

Jones v. State, 452 S.W.2d 365, 367 (Tenn. Crim. App. 1970) (citations omitted). If a defendant fails to support the motion for new trial with affidavits, a trial court, in its discretion, may hear the testimony of the witness at the hearing on the motion. State v. Todd, 631 S.W.2d 464, 466 (Tenn. Crim. App. 1981); see also Tenn. R. Crim. P. 33(c) (stating that "[a]ffidavits in support of a motion for a new trial may be filed with the motion or an amended motion. If filed, they shall be considered as evidence by the court. . . . The court may in its discretion allow testimony in open court on issues raised in the motion for a new trial.").

The only information as to King's anticipated testimony is in the motion for new trial, unsupported by any affidavits, that he would be willing to testify that "he was given a dockplate and various other items from Schefenacker, and that Jason Rodotz helped him to load these items. Mr. King stands ready and willing to be heard by this Honorable Court at the Motion Hearing." The trial court did not abuse its discretion by not allowing King's testimony at the hearing. First, as noted, there was no affidavit from the defendant attesting to his diligence in discovering King's testimony prior to trial. Neither is there an affidavit from King showing the materiality of his proffered testimony. Most importantly, the defendant has not shown how King's testimony would likely have changed the result at trial. The jury heard testimony from Galloway that he had given the defendant a set of doors and other employees occasionally took parts from the plant; the jury convicted the defendant nonetheless.

The defendant also asserted in the motion for new trial that Rodotz was fired by Schefenacker the day after the trial and that his trial testimony may have somehow been the result of duress exerted by Schefenacker. Recanted testimony may qualify as newly discovered evidence. State v. Mixon, 983 S.W.2d 661, 672 (Tenn. 1999). However, a new trial should be granted on the basis of newly discovered recanted testimony only if:

> (1) the trial court is reasonably well satisfied that the testimony given by the material witness was false and the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, or was surprised by the false testimony, or was unable to know of the falsity of the testimony until after the trial; and (3) the jury might have reached a different conclusion had the truth been told.

Id. at 673 n.17 (citations omitted). The motion for new trial did not include an affidavit from Rodotz, and there is no showing that he would have recanted his trial testimony. At the hearing, the State asserted that the defendant's family had been harassing Rodotz since the trial and that the defendant had subpoenaed Rodotz without even discussing with him the content of his testimony at the hearing. In response, the defendant's counsel asserted there had been no harassment and "I

-14-

would like to hear what he has to say now that he's not working there anymore. I think that would be very interesting." Speculation cannot be substituted for proof. The issue is without merit.

## **CONCLUSION**

Based upon the foregoing authorities and reasoning, we affirm the defendant's conviction and sentence.

 

_____
ALAN E. GLENN, JUDGE